BRACEY et al. v. LURAY.
No. 5571.

Circuit Court of Appeals, Fourth Circuit.
April 2, 1947.

Daniel E. Klein, of Baltimore, Md., for appellants.

William Saxon, of Baltimore, Md., for appellee.

Before PARKER, SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

After rather protracted litigation, (see D.C., 49 F.Supp. 821, 4 Cir. 138 F.2d 8), Bracey and others (plaintiffs below and appellants here, hereinafter referred to as employees) secured final judgments (July 17, 1944) in the United States District Court against Emanuel Luray, trading as Luray Iron and Metal Company (hereinafter referred to as employer) in the sum of $5,799.-60 for over-time pay and liquidated damages under the provisions of the Fair Labor Standards Act, 29 U.S.C.A. §§ 201–219.

After the entry of these judgments, employer declared that he was insolvent and unable to pay the judgments. Employer also furnished to employees an itemized statement, setting out in detail his liabilities and assets. According to this statement, employer's assets amounted to $4,672.14 and his liabilities were $10,516, so that his liabilities were more than double his assets. Accordingly, on August 31, 1944, an agreement for settlement of the judgments was entered into by counsel for employer and counsel for employees. Under this agreement, employer agreed to pay to employees the sum of $5,394.65 in full settlement of the judgments. The sum of $2,500, under the agreement, was to be paid immediately, the balance in monthly installments of $200 each. The amount fixed in the settlement agreement was sufficient to pay in full the claims of employees for minimum wages and for unpaid overtime, a nominal sum in payment of the judgments for liquidated damages, and full payment of the fees of counsel for employees and the Special Master to whom the District Court had referred the case.

Employer defaulted in the payment of some of the stipulated monthly installments at the time agreed. None of these defaults took place, however, until about four-fifths of the amount specified in the compromise settlement had been paid. These payments were all to have been made by November, 1945, whereas the final complete payment was not made until March 18, 1946. The settlement agreement contained the following provision: "9. Upon default by the party of the first part in the payment of any one of the monthly payments hereinbefore set forth, this agreement shall immediately be null and void and the entire balance due under said judgments shall become immediately due and payable and all payments theretofore made shall be applied to the reduction of the amounts in full of the judgments of said parties and thereafter the said parties shall not be restricted or limited in the prosecution of any legal process whatsoever for collection thereof."

Employees obtained from the District Court executions and attachments against employer for the purpose of securing payment of the unpaid balance of the judgments. Employer, on the strength of his fulfillment of the settlement agreement, filed in the District Court a motion to quash these executions and attachments and to have the judgments entered as fully satisfied. Upon the granting of this motion by the District Court, employees have duly appealed.

Two questions are clearly presented on this appeal: (1) Was the agreement for the settlement of the judgments valid when entered into; (2) If it was then valid, is it now binding upon the parties, in the light of employer's default in making payment of some of the agreed monthly installments, employer claiming that these defaults were waived by the conduct of employees. The District Court held that the settlement agreement was valid when entered into, and, further, that employees, by their conduct, had waived employer's defaults and breaches of the settlement agreement. Manifestly, from the standpoint of the public, this first question is of great practical importance.

Employees, contending that the agreement settlement lacks original validity, rely heavily upon two recent cases decided by the Supreme Court. Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296; D. A. Schulte, Inc. v. Gangi, 328 U.

S. 108, 66 S.Ct. 925. While broad general language may be found in the opinions in those cases that lends support to this contention of employees, it is well to consider the actual holdings. In the Brooklyn Savings Bank case, supra, the Court held merely that in the *absence of a bona fide dispute* between the employer and the employee as to liability, an employee's written waiver of his right to liquidated damages under § 16 (b) of the Fair Labor Standards Act does not bar a subsequent action by the employee to recover such liquidated damages. The Schulte case, supra, went a step further and squarely held that the employer's liability for liquidated damages under the same section of the Act could not be relieved by a compromise or *settlement of a bona fide dispute as to the coverage of the Act.* In the Schulte case, however, the majority opinion of Mr. Justice Reed (328 U.S. pages 114, 115, 66 S.Ct. 928) went on to say:

"We do not find it necessary to determine whether the liability for unpaid wages and liquidated damages that Section 16 (b) creates is unitary or divisible. Whether the liability is single or dual, we think the remedy of liquidated damages cannot be bargained away by bona fide settlements or disputes over coverage. Nor do we need to consider here the possibility of compromises in other situations which may arise". See, also, Phelan v. Carstens, Linnekin & Wilson, 187 Misc. 352, 62 N.Y.S.2d 214; Birbalas v. Cuneo Printing Industries, 7 Cir., 140 F. 2d 826, 828; Rigopoulos v. Kervan, 2 Cir., 140 F.2d 506, 508, 151 A.L.R. 1126; Rogan v. Essex County News Co., D.C., 65 F.Supp. 82. See, also, Dize v. Maddrix, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296.

Our case presents two features not present in either the Brooklyn Savings Bank case or the Schulte case. Here the compromise agreement was signed when the claims of the employees had been definitely adjudicated and, under a familiar doctrine of law, the claims had become merged in the judgments. The compromise agreement, therefore, purported to settle these judgments. And the District Court (we think quite properly) quoted and stressed a foot-note to the opinion in the Schulte case (328 U.S. at page 114, 66 S.Ct. 928) reading: "Petitioner draws the inference that bona fide stipulated judgments on alleged Wage-Hour violations for less than the amounts actually due stand in no better position than bona fide settlements. Even though stipulated judgments may be obtained, where settlements are proposed in controversies between employers and employees over violations of the Act, by the simple device of filing suits and entering agreed judgments, we think the requirement of pleading the issues and submitting the judgment to judicial scrutiny may differentiate stipulated judgments from compromises by the parties. At any rate the suggestion of petitioner is argumentative only as no judgment was entered in this case." Here is at least an implication that the rule of the Schulte case would not apply to stipulated judgments. In our case, the judgment was not stipulated but was *entered in favor of the employees after a full hearing,* including a reference to a Special Master. Such a judgment, we think, makes out an even stronger case in favor of the validity of a compromise than does a stipulated judgment.

In the instant case will be found another (and probably a stronger) distinctive feature—the *insolvency* of the employer, the judgment debtor. This feature brings about a drastic change in the whole picture. Here we have neither the "inequality of bargaining power" (Brooklyn Savings Bank case, 324 U.S. page 708, 65 S.Ct. 902, nor a situation covered by the policy "To permit an employer to secure a release from the worker *who needs his wages promptly* will tend to nullify the deterrent effect which Congress plainly intended that Section 16 (b) should have." Id., 324 U.S. page 710, 65 S.Ct. 903. Instead of an affluent employer attempting to profit by trading on the necessities of his employees, we have an insolvent employer (already with liabilities more than double his assets) faced with a judgment also exceeding in amount all of his assets.

If all of his creditors press him, bankruptcy of the employer would be the probable result and the employees would be faced with further legal proceedings, all the consequent delays, and, as a final result, payment of their judgments only in small part. All courts, high and low, state

and federal, must heed the difficulty of squeezing blood out of a turnip. A compromise settlement, apparently advantageous to the employees and seemingly fair to them on its face, is, under these circumstances, accepted by the employer and employees.

■ In Fort Smith & Western Railroad Co. v. Mills, 253 U.S. 206, 40 S.Ct. 526, 64 L.Ed. 862, the Supreme Court sustained a compromise agreement for wages under the celebrated Adamson Act, basing its decision squarely on the insolvency of the employer. Said Mr. Justice Holmes (253 U.S. at pages 208, 209, 40 S.Ct. 527): "But that is the present case. An insolvent road had succeeded in making satisfactory terms with its men, enabling it to go on, barely paying its way, if it did so, not without impairing even the mortgage security, not to speak of its capital. We must accept the allegations of the bill and must assume that the men were not merely negatively refraining from demands under the Act but, presumably appreciating the situation, desired to keep on as they were. *To break up such a bargain would be at least unjust and impolitic and not at all within the ends that the Adamson Law had in view. We think it reasonable to assume that the circumstances in which, and the purposes for which the law was passed import an exception in a case like this.*" (Italics ours.)

We think, in our case as in that one, "to break up such a bargain would be at least unjust and impolitic" and that the peculiar and distinctive circumstances in the instant case reasonably "import an exception" to the broad principles laid down in the Brooklyn Savings Bank case and the Schulte case, supra, negativing compromise settlements. And it is worthy of remark that in the Brooklyn Savings Bank case (324 U.S. at page 709, 65 S.Ct. at page 903) the majority carefully pointed out: "* * * Nor does the instant case involve exceptional circumstances of the kind held to justify a waiver agreement such as was upheld in Fort Smith & W. R. Co. v. Mills, 253 U.S. 206, 40 S.Ct. 526, 64 L.Ed. 862." We agree with the District Court that the compromise agreement in our case was valid and binding when made.

The Fair Labor Standards Act is a far flung statute controlling on a broad scale the commercial relations of employers and employees. The Supreme Court, in no uncertain terms, has stressed its humanitarian and sociological implications. We do not think, however, that judges, in construing and applying the Act, must completely divest themselves of all sense of economic reality and practical justice.

■ This brings us to the last question in the case, that of waiver. We agree again with the District Court that under the settlement agreement the default by employer in meeting the agreed monthly payments was a breach sufficiently material to enable the employees, if they so elected, to treat the settlement agreement (under Clause 9, set out earlier in this opinion) as "null and void" and to treat all future payments by employer as merely a "reduction of the amounts in full of the judgments." We think the District Court correctly held that employees did not elect to treat the settlement agreement as null and void; but that employees, on the other hand, by their conduct waived the right to annul the settlement agreement, so that this agreement continued in full force and effect.

Ultimately, employees received every cent of the amount set out in the compromise agreement. In some instances, upon accepting overdue monthly payments, counsel for employees did write to employer that these acceptances were not to be regarded as a waiver. But this attitude was not consistently maintained. Again and again, employer asked for more time in connection with the payment of the stipulated monthly installments; again and again, these indulgences were granted under circumstances from which it could fairly be inferred by employer (in spite of previous letters from employees' counsel) that previous breaches had been fully condoned by employees. In this connection we attach (as did the District Court) importance to a letter, dated January 3, 1945, from the counsel for employees to employer, containing these words:

"Though a reminder of the $200 payment that was due on January 1 was sent you a week previously, we have not yet received

that installment which constitutes a breach of the agreement. The judgment creditors, whom we represent, only accepted the proposition you submitted upon your distinct and unequivocable promise to make these payments punctually.

"I have tried to emphasize this fact previously because *I am quite sure they would insist upon declaring a forfeiture of the payments hitherto made and claim restoration of the original amounts due.*" (Italics ours.)

These words indicate rather clearly *not a present intention of forfeiture* but merely the *opinion of counsel* that employees *would insist* on a forfeiture (in the future) unless employer should make prompt payment of the monthly installments. The conduct of employees manifestly is inconsistent with a carrying out of this possible intention. And, as the District Court pointed out, "nothing was done (by employees) to repudiate the compromise agreement until August 9, 1946: that is, some five months after all payments were completed."

We do not regard as vital in this connection the fact that employer, though he asked for the surrender of the releases executed by employees and held in escrow, did not insist upon this surrender. The District Court so held, finding [68 F.Supp. 603]: "However, the defendant's attitude was reasonable because, by the weight of the credible evidence, the then attorneys for the plaintiffs, Messrs. Loeffler and Goertz, did not disclose any real intention, nor did their clients, of pursuing the matter further."

Another fact, not without interest, is pointed out by the District Court: "Indeed, we cannot blink the fact that the original counsel for these plaintiffs retired from the case and did nothing whatsoever to press the position now assumed on behalf of the plaintiffs, and such was not done until the entry of Mr. Klein, counsel for the plaintiffs, who did not represent the plaintiffs at all until August 9, 1946."

In Kemp v. Weber, 180 Md. 362, 365, 366, 24 A.2d 779, 780, the Court of Appeals of Maryland stated: "When a party to a contract is faced by some failure in carrying out its terms on the part of the other party, he has, in general, either a right to retain the contract, and collect damages for its breach, or a right to rescind the contract and recover his own expenditures. Obviously he cannot do both. The contract cannot be in effect, and at the same time rescinded. If in effect, he can get damages; if rescinded, he must return his benefits, and receive his expenditures. He cannot, of course, retain the benefits and get back his expenditures. He would then be receiving a free gift of whatever he got under the contract. He, therefore, has a choice."

And the same court, in Shriver Oil Co v. Interocean Oil Co., 157 Md. 341, 352, 146 A. 223, 227, said: "When payments have been customarily received later than a day specified and the dealer decides to disallow any further grace, in order to put himself in position to rescind for failure to pay on time he must give the debtor notice that the terms of the contract must be observed, or that no further delays will be tolerated * * *."

The judgment of the District Court is affirmed.

Affirmed.